# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 17, 2013

## STATE OF TENNESSEE v. BRENT ROWDEN

**Direct Appeal from the Circuit Court for Wayne County**
**No. 15069    Robert Jones, Judge**

**No. M2012-01683-CCA-R3-CD - Filed September 5, 2013**

A Wayne County Jury convicted Defendant, Brent Rowden, of second-degree murder (County One), tampering with evidence (Count Two), and attempted initiation of a process to manufacture methamphetamine (Count Three). He received concurrent sentences of thirty-seven years as a Range II multiple offender for second-degree murder, thirteen years as a persistent offender for tampering with evidence, and thirteen years as a persistent offender for attempted initiation of a process to manufacture methamphetamine. The trial court ordered Defendant's effective thirty-seven-year sentence to be served consecutively to an eight-year sentence in Lawrence County. On appeal, Defendant argues that the trial court erred in denying the motion to suppress his statements to police. After a thorough review, we affirm the judgment of the trial court. However, the matter is remanded to the trial court for entry of a corrected judgment in Count One to reflect Defendant's offender status as Multiple rather than Career.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**
**Remanded for Entry of a Corrected Judgment in Count One**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, Jr. and ROBERT W. WEDEMEYER, JJ., joined.

Eric C. Davis, Dothan, Alabama, for the appellant, Brent Rowden.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Mike Bottoms, District Attorney General; and J. Douglas Dicus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Background

Although Defendant does not challenge the sufficiency of the convicting evidence on appeal, we will briefly review the evidence supporting Defendant's convictions. On April 24, 2011, the body of Scott Sobey, the victim, was found floating in the Tennessee River, north of the Pickwick Dam, in Hardin County. Law enforcement officers recovered the victim's body, and it was sent to Memphis for an autopsy. It was determined that the cause of death was gunshot wounds and sharp-force injuries (cuts), and the manner of death was homicide. The victim had two gunshot wounds to the head and one to the chest. A bullet was recovered from the victim's brain. The victim also had three stab wounds.

It was eventually determined that the victim was missing from a halfway house in Memphis and had last been seen leaving there with Defendant, who was from Lawrence County. Chief Deputy Mike Fielder of the Hardin County Sheriff's Office received information that a vehicle connected with the victim's death was at Grimes Recycling in Lawrence County. Micheal Polk, an employee of Grimes Recycling, testified that the company had purchased the vehicle from Defendant on April 25, 2011, for $206. Mr. Polk testified that he obtained the title for the vehicle from Defendant, and he obtained a copy of Defendant's driver's license as part of the transaction. Chief Deputy Fielder then notified the Lawrence County Sheriff's Office that Defendant was a person of interest in the case. Defendant was taken into custody on April 27, 2011, at an apartment on Nixon Avenue in Lawrence County. He was interviewed by Captain Adam Brewer, Lieutenant Nathan Neese, and Sergeant Bud Smith of the Lawrence County Sheriff's Office. Defendant waived his *Miranda* rights and gave a statement indicating that he shot the victim on April 11, 2011, because the victim was trying to burn him and his car with a "shake bottle" that the victim was using to make methamphetamine. Defendant told officers that he shot the victim "two or three times in his chest and possibly three times in the head." He also admitted that he had cut the victim's throat. Defendant told officers that he loaded the victim's body into Defendant's car, drove to Pickwick Boat Landing, and dumped the victim into the water. Defendant said that he threw the gun and knife "into the swirls at the river." He also said that he burned his clothing on the side of the road, cut the carpet from the back of his car, and cleaned up the blood inside the car. In the next few days, he sold his car to Grimes Recycling on U.S. Highway 64 in Lawrence County. It was eventually determined that the offenses occurred in Wayne County.

Upon learning that the offenses occurred in Wayne County, Chief Deputy Fielder contacted the Wayne County Sheriff's office, and the information was turned over to Detective Kenneth Martin. Detective Martin took custody of Defendant the following day,

April 28, 2011. Defendant led Detective Martin to the area of Caperton Hollow Road in Wayne County where the offenses occurred. Defendant was then taken to the Wayne County Sheriff's Office where he again waived his *Miranda* Rights and gave a statement at 3:05p.m. Defendant admitted to shooting the victim and cutting his throat with a butcher knife because the victim threw a bottle he was using to make methamphetamine at Defendant and threatened to burn Defendant's car. He reiterated to Detective Martin that he loaded the victim's body in his car, stopped to put gas in the car, and drove to the boat ramp at Pickwick Dam and dumped the victim's body in the river. Defendant told Detective Martin that he changed clothes twice, but could not remember where he put them, and he cut the carpet from the back of the car and tossed it into a creek. He also cleaned blood from the ceiling light of the car and then sold it to Grimes Recycling. Defendant told Detective Martin that he purchased the gun, which was a .380 Glock, on April 11, 2011.

Defendant gave a second statement to Detective Martin the following day, April 29, 2011, at 10:10a.m. He told Detective Martin that after the murder, he threw the gun in the bushes at the house on Caperton Road. Defendant admitted that he had stolen the gun from his cousin's residence when no one was home. He again said that he did not recall what happened to his clothes, and he thought that he threw the knife into the river. Detective Martin later recovered the gun from the bushes at the residence on Caperton Road. Chief Deputy Fielder turned Defendant's car over to Detective Martin on May 6, 2011.

Agent Bradley Everette of the Tennessee Bureau of Investigation (TBI), an expert in DNA identification, testified that he searched Defendant's vehicle looking for any DNA profiles inside the car. He found human blood stains in the hatchback area of the car that were later determined to be from the victim.

*Suppression Hearing*

Captain Adam Brewer of the Lawrence County Sheriff's Department testified that he and Sergeant Bud Smith interviewed Defendant on April 27, 2011, regarding the disappearance and death of the victim, Scott Sobey, who was from Lawrence County. Captain Brewer had previously been contacted by the Hardin County Sheriff's Department, who said that they had found the victim's body. Captain Brewer learned that Defendant was one of the last people to have seen the victim alive. He found Defendant on April 27, 2011, at the Nixon Apartments and arrested him pursuant to a violation of probation warrant.

Captain Brewer testified that the interview took place at the Lawrence County Sheriff's Office in the interview room. He "Mirandized" Defendant and initially indicated that they were looking into the victim's case as that of a missing person and asked if Defendant could help find the victim. Captain Brewer testified that Defendant agreed to talk

and signed a waiver of his *Miranda* rights at 7:22 p.m. on April 27, 2011. Defendant began answering questions concerning his knowledge of the victim's disappearance. Captain Brewer testified that Defendant "was kind of scattered with answering his questions at first, so we kind of let him get his thoughts together."

Captain Brewer testified that Lieutenant Nathan Neese also attended the interview which lasted "nearly three hours, off and on, with the three of use being in there." When asked if Defendant's statement was reduced to writing, Captain Brewer testified:

No. When we got to the point where we began talking about that we had found Mr. Sobey and that it became not a missing person's case anymore, we actually knew where he was at and that he was dead, he began talking to us, and at that point decided he needed to talk to an attorney before we were able to write anything down.

Captain Brewer testified that the interview was immediately terminated, and no further questions were asked of Defendant. He said, "[Defendant] actually tried to make more statements as he left, and we advised him that he had invoked his right and that he needed an attorney present before we could talk anymore."

Later that evening, Captain Brewer was contacted by corrections officer Blaine Bates who indicated that Defendant wanted to speak with investigators again. Officer Bates brought Defendant to the interview room a second time, and Captain Brewer, Lieutenant Neese, and Sergeant Smith were again present. Captain Brewer testified:

We advised him again that he had invoked his right and asked him if he wanted to withdraw that and still talk to us. He said he did. We read *Miranda* to him again, explained to him, you know, that if he wanted to continue to invoke his right to an attorney, that that was fine.

He wanted to - - he made the statement that, "The medical examiner said that he was shot more than once, is it going to be - - will that hurt my self-defense claim?"

We continued to say, "We can't talk to you about that till you understand your rights and you let us know that you don't want to talk to an attorney."

So at that point he was read his rights again. He did sign a statement saying he did not want an attorney, he wanted to talk to us about it, and that's when we continued with the interview.

-4-

The second waiver of rights form was signed at 11:11p.m. on April 27, 2011. Captain Brewer testified that there was also a handwritten note that Defendant signed indicating that he wished to recant his previously invoked right to an attorney and talk to the officers.

Captain Brewer testified that Defendant then gave a written statement that contained the following, as written out by Lieutenant Neese:

On Friday, April 9, 2011, I went to Memphis to pick up Scott Sobey at a halfway house. We brought Scott to Eric Short's house in Iron City. Scott and Eric were cellees in prison, and that's where we all met. Me and Scott used dope together over the weekend.

Scott started talking about being a hitman and how he has killed little girls, it was hard to hear them scream. Scott kept talking about how many people he had killed.

On Monday, April 11, 2011, I went back to Eric Short's to pick up Scott and drive him back to Memphis. Before I went and picked him up, I stopped and got a piece (a .380 handgun) because I was afraid of what Scott was going to do to me. I picked Scott up, and we went out to a house trailer where there are some junk cars. It's off a road past Turner Willims' old store on Holly Creek in Wayne County.

Me and Scott were cooking dope, and Scott started trying to hit me and burn me and my car with the shake bottle. I was at the car kind of behind it, and I took out the .380 and shot Scott in the chest. I realized he was still alive, so I shot him in the head. I think I shot him two or three times in his chest and probably three times in the head. I could see he was still breathing and still alive, so I got a butcher knife that I had in my car and cut Scott's throat.

It took me a little bit, but I was able to get his body, Scott's body, loaded into the car. I then drove to Pickwick Boat Landing, where I backed up to the boat ramp. I knew I was close to the water because I could hear the muffler bubbling in the water. I opened the hatch, rolled his body into the water.

I left there and threw the gun and knife into the [swirls] at the river. I stopped on the side of the road and burned my clothes. I cut the carpet out of the back of my car and cleaned up the blood out of the back of my car.

I then went to my cousin's house on Depot Street in Collinwood and slept. In the next few days, I sold my car to Grimes Recycling on U.S. Highway 64 in Lawrence County.

Captain Brewer testified that he asked Defendant if there was anything that he wanted to add or take away from the statement. Defendant replied: "I just want to clarify that I dropped Scott off at the house trailer with the junk cars, and I left to get some batteries before cooking dope. That's when I stopped and got the piece (.380 handgun)." Captain Brewer testified that Defendant signed and dated the statement. Based upon Defendant's statement, it was ascertained that the victim's murder occurred in Wayne County and Detective Kenneth Martin of the Wayne County Sheriff's Department was contacted about taking over the investigation.

On cross-examination, Captain Brewer testified that Defendant was at Amy Gatlin's apartment when he was picked up for the probation violation warrant. He said:

We received information that he could be possibly staying there from a contact of his mother's. We were able to do surveillance on the apartment complex from the Walgreens parking lot and CVS parking lot from up the street. We had observed a subject come out in the yard matching his description several times looking around. Myself and Lieutenant Neese at that point came down Nixon Avenue, and I observed Brent Rowden standing in the front yard with a baseball bat.

Captain Brewer testified that Defendant was arrested in the front yard of the apartment complex and carried back up to the porch of Ms. Gatlin's apartment. Captain Brewer walked inside the apartment and observed "some marijuana paraphernalia or maybe a Coke can where they had been smoking drugs off the top of it." There was also some burnt foil. Captain Brewer testified that his investigation revealed that Defendant was a user of methamphetamine. A search of Ms. Gatlin's apartment did not reveal the presence of methamphetamine.

Captain Brewer testified that in his experience, a person on methamphetamine may be overly paranoid. He admitted that Defendant's behavior prior to his arrest was indicative of someone who was paranoid. He further admitted that when Defendant was taken into custody, he "exhibited signs of a meth user: paranoid, somewhat irritable." Captain Brewer testified that when they approached Defendant, he raised the baseball bat, and he said that "he thought he was looking at Detective Mills down the street." Captain Brewer explained that Detective Mills was a drug agent with the Lawrence County Sheriff's Department.

-6-

When asked if he felt that Defendant had been actively using methamphetamine at the time, Captain Brewer testified:

> From my experience dealing with methamphetamine addicts - - and I was assigned to narcotics for over five years - - once somebody is using that drug and they become a user, it's hard to tell if they're actually under the influence or - - it just has a permanent effect on their behavior and the way they act, so it's hard for me to determine whether or not they've actually smoked any. I can just kind of determine they are a user.

Captain Brewer felt that Defendant would have exhibited the same paranoia whether he waited two weeks or a month to interview Defendant. He said, "Once they get that - - exhibit that type of behavior, in my experience they typically stick with that, so I felt like it was as good a time as any to go ahead and talk to him."

On redirect examination, Captain Brewer testified that there was never any concern that Defendant did not understand his rights or that he was intoxicated to the point that he did not understand what he was saying. He acknowledged that Defendant gave specific details in his statement, and Defendant invoked his right to an attorney at one point. Captain Brewer testified that if he had seen signs of intoxication to the point of impairing Defendant, he would have stopped the interview.

Detective Kenneth Martin of the Wayne County Sheriff's Department testified that he traveled to Lawrence County on April 28, 2011, to pick up Defendant and transport him to Wayne County. He and Detective Cameron McDonald interviewed Defendant in the investigator's office. Detective Martin read Defendant his *Miranda* rights, and Defendant signed a waiver. The interview with Defendant resulted in a typed statement which Defendant acknowledged and signed. Detective Martin testified that Defendant read the statement before signing it, and the statement was read to him. The statement contained the following:

> I picked up Scott Sobey at a halfway house in Memphis on Friday, April 8, 2011, and took him to Eric Short's house in Iron City. On Monday, April 11, 2011, I picked up Scott Sobey at Eric Short's house in Iron City, and we went to Ricky McCrary's house on Caperton Hollow Road.
>
> I left and went to the Dollar Store in Collinwood to get lithium batteries. When I returned from the Dollar Store, Scott Sobey was in the process of making meth. When I walked up to Scott Sobey, he was in the shed behind the house, and he threw the bottle at me. I went up the bank, and Scott went in

front of the car and said he was going to burn the car, and that is when I shot Scott in the chest or stomach.

I walked back down the bank, and he was still alive, and I shot Scott Sobey in the head. I shot him about five times, and he was still alive and he was breathing shallow, and that is when I cut his throat with a butcher knife.

I stood around for a while, and then I loaded Scott in the hatchback. I like to have never got him loaded in the hatchback, [. . .]

I then drove to Little Cincy's [sic ] and got gas and went to Pickwick, where the motel and boat ramp is located, and I put Scott in the river. I'm not going to say what I did with the knife and gun. I just got read [sic] of them, [. . . ]

I changed clothes twice because I had got wet, and don't remember what I did with the clothes.

Defendant told Detective Martin that the gun was a .380 Glock, and he sold the car at "Grimes Scrapyard." He claimed that he purchased the gun on April 11, 2011, when he went to buy the lithium batteries. Defendant told Detective Martin that no one was with him when the murder took place at Mr. McCrary's house. After he disposed of the victim's body, Defendant said that he cut the carpet from the back of his car and cleaned blood from the ceiling near the light. He said, "I was trying to cover it up and get rid of it, anything." Defendant told Detective Martin that he threw the carpet in a creek. When asked why he thought Defendant was going to kill him, Defendant said that the victim told him "he was a hitman and enforcer and he had killed 36 people."

Detective Martin conducted a second interview with Defendant the following day on April 29, 2011, to clarify some issues. Defendant again waived his *Miranda* rights and agreed to talk. During the second interview, Defendant said that he threw the gun in some bushes at Mr. McCrary's house. He admitted that he had stolen the gun from his cousin, Charles Pulley. He said that he took the gun from Mr. Pulley's house when no one else was at the home. Defendant did not know what happened to his clothes but said that he threw the knife into the river. Defendant was later taken back to Mr. McCrary's house, and the gun was recovered from the property.

On cross-examination, Detective Martin testified that he "Mirandized" Defendant when he got into the car before leaving Lawrenceburg. They proceeded to Mr. McCrary's residence on Caperton Hollow Road near the Lawrence-Wayne County line. Defendant then showed Detective Martin and others where he shot the victim. At that time, Defendant did

-8-

not mention anything about the gun being in the bushes. Detective Martin testified that Defendant was not behaving unusually when he picked Defendant up in Lawrence County. He did not notice Defendant being agitated or paranoid. Detective Martin did not observe anything that indicated that Defendant could not intelligently waive his rights and give a statement. Defendant did not have any difficulty answering questions.

Defendant testified that at the time of his arrest on April 27, 2011, he was under the influence of illegal drugs. He said:

> When they arrested me, I mean, I was so high, you know what I mean, that, I mean, I was just zonked. I was just real high, was shooting it into my arm, you know, and you get higher that way than you do when you smoke it.
>
> They said they didn't have no evidence, no drugs up there. They come and asked me to search the apartment, and they found the bottom of a can that had residue on it because I told them it was in there. And they said if that's all that was in there, they wasn't worried about it. I said they could go up there, and they went up there and got it.
>
> All I'm saying is I was shooting it, and there's a lot of difference when you shoot drugs than when you smoke it.

Defendant testified that he had been using methamphetamine on and off for approximately seven years, and he was addicted to it. He said that he would lose track of time whenever he had been awake for so long. Defendant testified that at the time of the victim's murder, he had been awake for three to four days, and the victim had been awake for fourteen days. Defendant did not know how many days that he had been awake at the time of his arrest. He said that he had shot methamphetamine into his veins approximately one hour before police arrived. He did not believe that he was in a condition to make intelligent and rational choices at the time.

Defendant testified that he was under the influence of methamphetamine when he gave both statements at the Lawrence County Sheriff's Department. He acknowledged signing the waiver of rights form. However, he claimed that he was expecting his lawyer to be there when he went back for the second interview. Defendant claimed that he decided to give a statement because the investigators had pizza and a Dr. Pepper for him, and he was "starving."

On cross-examination, Defendant testified that he had been using drugs throughout the night before his arrest. He acknowledged that he could remember the officers coming

to arrest him, and he remembered them talking to him about drugs in the apartment. He admitted that he understood what they were talking about. Defendant said, "They wasn't asking me about nothing but the probation violation."

Defendant testified that after he arrived at the Lawrence County Jail and went into the interview room, he remembered a piece of paper, but thought that his attorney was coming. He agreed that the statement read by Captain Brewer during the suppression hearing was "very close to what happened." Defendant admitted that he remembered what happened when the victim died, and he accurately told Captain Brewer what happened that night. Defendant testified that he somewhat understood his *Miranda* rights, and he acknowledged that he had been arrested many times in the past, although not for murder, and had been advised of his rights. However, he said, "Not that kind of pressure, though. It was different."

Defendant testified that he remembered that after he asked for his attorney, the interview stopped, and he was taken back to his cell. He admitted tapping on the glass and telling Officer Bates that he wanted to speak with investigators again. Defendant agreed that he was again advised of his *Miranda* rights, which he waived, and he gave a statement because he was "starving," and the officers had pizza and a Dr. Pepper. He claimed that the "paper" and the pizza were "all a package." Defendant ultimately testified that he knew what he was saying to Captain Brewer, and he understood his *Miranda* rights because he invoked his right to an attorney.

Defendant testified that he voluntarily went to the scene with Detective Martin, and he told Detective Martin his version of events. However, he claimed that Detective Martin "got it all mixed up." Defendant agreed that Detective Martin advised him of his *Miranda* rights, and he signed a waiver. He spoke with Detective Martin a second time the following day.

## II. Analysis

### A. Denial of Motion to Suppress

From a review of Defendant's brief, he appears to contend that the trial court erred in failing to grant his motion to suppress the statement he gave to the Lawrenceburg officers on April 27, 2011. He contends that his statement to investigators was not "knowingly or intelligently" given because he was under the influence of drugs at the time. Defendant further complains that his statement was not audio or video recorded and that investigators failed to determine how well he could read or what grade he completed in school.

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). We review a trial court's applications of law to the facts *de novo*, however. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The party prevailing at the suppression hearing is further "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23.

The Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court concluded that in the context of "custodial interrogation" certain procedural safeguards are necessary to safeguard this privilege against compulsory self-incrimination. *Id*. at 444, 86 S.Ct. 1602. More specifically, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* Those safeguards include the now familiar *Miranda* warnings—namely, that the suspect be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479, 86 S.Ct. 1602. If the police fail to provide these warnings, any statement obtained as a result of custodial interrogation will not be admissible at trial during the prosecution's case-in-chief, even if the statement is otherwise voluntary. The *Miranda* Court was concerned that the "interrogation environment" created by interrogation and custody would "subjugate the individual to the will of his examiner" so as to undermine the privilege against compulsory self-incrimination. *Id.* at 457-58, 86 S.Ct. 1602. In *Dickerson v. United States*, the United States Supreme Court reaffirmed that "*Miranda* and its progeny . . . govern the admissibility of statements made during custodial interrogation in both state and federal courts." 530 U.S. 428, 432, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *see also State v. Walton*, 41 S.W .3d 75, 82 (Tenn. 2001). Consequently, if the defendant's statement resulted from custodial interrogation, the statement must be excluded from evidence if the police failed to provide the defendant *Miranda* warnings. *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Walton*, 41 S.W.3d at 86.

*Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. Thereafter, the United States Supreme Court has explained that "interrogation" refers not only to express questioning but also to any words, actions, or practices that the police should

know are reasonably likely to elicit incriminating information from a suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *see also Walton*, 41 S.W.3d at 85.

The Tennessee Supreme Court has held that "[a] valid waiver of *Miranda* rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights." *State v. Rogers*, 188 S.W.3d 593, 606 (Tenn. 2006)(citing *Wyrick v. Fields*, 459 U.S. 42, 47, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982)). Furthermore, "[c]ourts must examine the totality of the circumstances to determine whether renewed warnings are required." *Id.*

> The factors to be considered when assessing the totality of the circumstances include: 1) the amount of time that has passed since the waiver; 2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; 3) any official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) any indicia that the suspect subjectively understands and waives his rights. Because of the infinite variety of circumstances a case may present, the list of factors is by no means exhaustive. The weight to be accorded different factors will vary depending on the particular facts of the case.

*Rogers*, 188 S.W.3d at 606 (internal citations omitted).

Concerning this issue, the trial court made the following findings:

> Most of the time where similar issues arise, the warnings are given, the request for the attorney is made, and maybe the defendant is in custody for a longer period of time than we have in today's case, and there's a second interview at the defendant's request without new warnings.

> But it looks to me like in this case, the government had crossed T's and dotted I's every time they had a chance to do so and have complied with the letter and the spirit of *Miranda v. Arizona* and its [progeny].

> Specifically, the preponderance of the evidence today establishes that [Defendant] may have shown the signs of being a methamphetamine user. I'm not sure that he even testified about the substance he was using. He said he was shooting drugs, but I don't think he testified about what drugs.

But all the questions were asked and answered with regard to or by the officers about methamphetamine, which I understand generally to be an upper to make someone more alert, and certainly not a suppressant.

The risk, it seems to me, would be that when a person is coming off of several days on methamphetamine, without any rest, that he may be particularly vulnerable to fatigue and other issues that might have some effect upon his understanding or his voluntary waiving of his rights.

I'm not necessarily accrediting what [Defendant] said about [sic] he had just shot some drug and the effect it may have had on him, but there was nothing to indicate from the overall testimony, that he was impaired, as a typical drunk might be impaired.

Instead, if anything, he was alert, hungry, and understood not only his rights, but actually understood them enough to exercise them and to decline to talk further during that first interview without actually having an attorney present.

The officers were cautious in making it clear to him as he went back with the correction officer toward his cell that they couldn't talk to him once he made that request.

And then he made a very express waiver of the right to have an attorney present before the second interview took place and the multi-page statement that largely amounts to the confession.

There may be some definite issues raised in that it may not be a pure confession, but it's at least an admission against interests that the Court finds today is admissible.

With regard to the statement obtained by Investigator Martin with the Wayne County Sheriff's Department, [Defendant] had the benefit of additional *Miranda* warnings about his rights to remain silent and have a lawyer before he answered any questions, and that first warning to him by Mr. Martin on April 29 at approximately 10:00 a.m. was a good 15 or so hours after the 7:00 p.m. warning the night before, certainly more than 15 hours after his arrest - - -actually, no, that's the 29th.

\*       \*       \*

-13-

I'm looking at two different ones. The 28th one was at 3:05 p.m. and about 20 hours after his arrest. And then the last statement from the fourth interview was on April 29 at 10:00 a.m. about 39 hours after the arrest.

And the responses of [Defendant] to the warnings, his waiver of his rights, and the statements given seem to be consistent with the earlier statements given to the Lawrence County officers on the night of April 27.

Therefore, the State has carried its burden of showing that [Defendant] was advised of his rights, understood those rights, and voluntarily waived those rights, with extra care being taken by the officers after his first request for an attorney to make sure that he was expressly waiving those.

I think the appellate judges that would be reviewing this record would understand that between 7:30 and 11:00 p.m., that the officers themselves cannot appoint or obtain a lawyer for the accused, that essentially, the accused just quits talking any until he's taken before a magistrate or a judge, at which time an attorney may be appointed if he's indigent and qualifies for an appointed counsel.

In any event, the questioning must stop and the officers must not do anything to interrogate by questions, gestures, or other means, once he's indicated that interest in having an attorney.

The officers did nothing wrong in not having an attorney present, and the defendant, as I say, expressly waived his rights and reinitiated the interview process.

And he still seems to be clear here today he thought he was serving society by ridding it of a bad person, and I assume he's not had any drugs since on or before April 27 of 2011 because he appears to have been in custody continuously since that time.

We agree with the trial court. Evidence presented at the suppression hearing established that although Defendant may have been a methamphetamine user at the time of his statement, his statement to police was freely and voluntarily made. When Captain Brewer was asked if he felt that Defendant had been actively using methamphetamine at the time of his statement, Captain Brewer testified:

From my experience dealing with methamphetamine addicts - - and I was assigned to narcotics for over five years - - once somebody is using that drug and they become a user, it's hard to tell if they're actually under the influence or - - it just has a permanent effect on their behavior and the way they act, so it's hard for me to determine whether or not they've actually smoked any. I can just kind of determine they are a user.

Captain Brewer felt that Defendant would have exhibited the same signs of a methamphetamine use, such as paranoia and irritability, whether he waited two weeks or a month to interview Defendant. He said, "Once they get that - - exhibit that type of behavior, in my experience they typically stick with that, so I felt like it was as good a time as any to go ahead and talk to him."

Captain Brewer testified that there was never any concern that Defendant did not understand his rights or that he was intoxicated to the point that he did not understand what he was saying. He acknowledged that Defendant gave specific details in his statement, and Defendant invoked his right to an attorney at one point. Captain Brewer testified that if he had seen signs of intoxication to the point of impairing Defendant, he would have stopped the interview. We also note that at one point, Captain Brewer asked Defendant if there was anything that he wanted to add or take away from his statement. Defendant replied: "I just want to clarify that I dropped Scott off at the house trailer with the junk cars, and I left to get some batteries before cooking dope. That's when I stopped and got the piece (.380 handgun)."

Defendant's own testimony at the suppression hearing demonstrates that his statement was freely and voluntarily given. He remembered officers coming to arrest him, and he understood what they were talking about. Defendant agreed that the statement given to Captain Brewer on April 27, 2011, was "very close to what happened." He admitted that he remembered what happened when the victim died, and he accurately told Captain Brewer what happened that night. Defendant testified that he had been arrested many times in the past and had been advised of his rights. He admitted at the suppression hearing that he somewhat understood his *Miranda* rights. Defendant ultimately testified that he knew what he was saying to Captain Brewer, and he understood his *Miranda* rights because he invoked his right to an attorney.

Defendant also briefly mentions that his statement was not audio or video recorded and that investigators failed to determine how well he could read or what grade he completed in school. However, Defendant has waived these issues for failing to raise them in his motion to suppress or present any evidence at the suppression hearing concerning the issues. Tenn. R. Crim. P. 12(b)(3); Tenn. R. Crim. P. 12(f); and Tenn. R. App. P. 36(a). Even if not

-15-

waived, these issues are without merit. The Tennessee Supreme Court has ruled that "neither the state nor the federal constitution requires electronic recording of interrogations." *State v. Godsey*, 60 S.W.3d 759, 771 (Tenn. 2001). Moreover, Defendant does not attempt to argue in his brief how his ability to read or the last grade he completed in school affected the admissibility of his statement.

Based on our review of the totality of the circumstances surrounding the giving of Defendant's statement, we conclude that the evidence does not preponderate against the trial court's finding that admission of Defendant's statement did not violate Fifth Amendment principles. The trial court properly denied Defendant's motion to suppress, and Defendant is not entitled to relief on this issue.

*B. Sentencing Error*

Although not raised by either party, the judgment form in Count One, reflecting Defendant's conviction for second-degree murder, a Class A felony, incorrectly indicates that Defendant is a Career offender. However, the transcript of the sentencing hearing reflects that Defendant was actually sentenced as a Range II Multiple offender for that offense. When there is a conflict between the transcript and the judgment form, the transcript controls. *See*, *e.g. State v. Moore*, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991); *State v. Jimmy Lee Cullop*, Jr., No. E2000-00095-CCA-R3-CD, 2001 WL 378543, at *6)(Tenn. Crim. App., April 17, 2001); and *State v. Donald Edward Lynch*, No. E2008-01435-CCA-R3-CD, 2009 WL 2588904, at *8 (Tenn. Crim. App. Aug. 24, 2009). The evidence presented at the sentencing hearing reflected that Defendant had three prior convictions for Class C felonies, and all parties agreed that Defendant was a Multiple offender. *See* Tenn. Code Ann. § 40-35-106(a)(1). Therefore, we remand to the trial court for correction of the judgment in Count One in accordance with this opinion.

For the foregoing reasons, the judgment of the trial court is affirmed. However, the matter is remanded to the trial court for entry of a corrected judgment in Count One to reflect Defendant's offender status as Multiple rather than Career.

_____
THOMAS T. WOODALL, JUDGE